No. 19,558.

SAN MIGUEL BASIN STATE BANK *v.*
TOM FINCH AND GLEN GREAGER.
(369 P. [2d] 544)

Decided February 26, 1962.   Rehearing denied March 26, 1962.

Messrs. WELLER, FRIEDRICH and HICKISCH, Messrs. BROOKS and MILLER, for plaintiff in error.

Messrs. BRYANT, PETRIE, WALDECK and KING, for defendant in error TOM FINCH.

Mr. VICTOR F. CREPEAU, for defendant in error GLEN GREAGHER.

*En Banc.*

Opinion by MR. JUSTICE HALL.

HERE we refer to the plaintiff in error as the Bank and to the defendants in error as Finch and Greager.

In the trial court there were several parties involved in addition to those appearing here, and several claims there presented that are not before us.

The trial court entered judgment in favor of Finch and against the Bank and one F. M. Bottum for $25,000.00, and dismissed the complaint of the Bank against Greager wherein it sought judgment against him for $6000.00, which the Bank claims was an overpayment to Greager and which amount it claims it is entitled to recover back from Greager in the event it be finally determined that the Bank is answerable for failing to perform its duties as alleged escrow agent for the purpose of distributing certain funds.

There is very little dispute in the evidence presented on which the parties predicate their claims.

By way of introduction we point out that the uncontradicted evidence shows that "The Bank is a small bank

— about a million dollars." F. M. Bottum, beginning in 1950 and through 1957, had been executive vice-president, cashier and general manager of the Bank; his wife, Edith Bottum, was assistant cashier; his son-in-law, Dan Noble, was a cashier, and a son, Marvin Bottum, also worked there and had been elected a cashier.

Prior to November 15, 1952, Finch was the owner of two unpatented mining claims:

Echo No. 6 and Jack Rabbit, located in Montrose County, Colorado:

On that date Finch executed a mining lease granting to one Karren and one Pischel the right, for a period of two years, to mine, extract and remove ore from the Echo No. 6. Karren and Pischel operated under this lease for a short time, then Karren turned it all over to Pischel, who finally took Bottum in with him and together they operated for a time, but prior to November 15, 1954, the expiration date of the lease, operations had been discontinued and the lease was abandoned.

Prior to May 20, 1952, Greager was the owner of eight unpatented mining claims located in Montrose County, known as Hatch Nos. 1, 2, 3, 4, 5, 6, 7 and 8, and had contracted to buy from Dee Finch claims known as Echo 1, 2 and 3. These claims are adjacent to two claims of Finch. On the date mentioned, Greager was indebted to the Bank, also to Dee Finch, on the purchase price of Echo 1, 2 and 3. On that date Greager executed and delivered to the Bank his quit claim deed conveying to the Bank the eight Hatch claims. Although the deed is an absolute conveyance, all agree that it was given as security for his indebtedness to the Bank.

On July 27, 1954, Finch and Greager executed and delivered to F. M. Bottum a document prepared by Bottum labeled "Option Agreement," which reads as follows:

"We, Glen Greager and Tom Finch, Hereby give F. M. Bottum option to sell mining claims, Echo 1, 2, 3, 6; Hatch claims 1, 2, 3, 4, 5, 6, 7, 8 and Jack Rabbit, all located in Bull Canyon area — the consideration for the

group is $150,000.00, this option dated July 27, 1954 and expiring August 27 1954. This option is subject to the sale of the Jack Rabbit which expires August 1st 1954

Witness                        Signed Tom Finch

                                      Owners

                               Glen Greager

                                 Owners."

Prior to the expiration date set forth in this document, at the request of Bottum, the time within which the option could be exercised was extended by adding to the original document the following:

"We, the undersign [sic] agree to an extension of this option.

                               Glen Graeger

                               Tom Finch"

Sometime prior to September 6, 1954, Bottum notified Finch and Graeger that he had been able to sell the optioned claims for $200,000.00, on terms, not all cash.

On September 6, 1954, Bottum entered into a written contract with Richard Mohler and Robert Mohler, whereby he agreed to sell and they agreed to purchase the thirteen claims for $200,000.00, payable $25,000.00 down, $50,000.00 on or before December 6, 1954, $62,-500.00 on or before December 6, 1955, and $62,500.00 on or before December 6, 1956.

This contract further provided that the Bank:

"* * * is hereby designated to act as escrow holder of the documents of conveyance * * * that the down payment * * * has been delivered to the escrow holder this date to be held pending the deposit of the necessary instruments including quit claim deeds from Glen Graeger, Tom Finch and Dee Finch as grantors and Richard Mohler and Robert Mohler as grantees * * * the said down payments shall be delivered to the party of the first part [Bottum] and with further instructions that said escrow holder shall receive and credit the remaining payments * * * upon the payments being made * * * the escrow holder is instructed to deliver all of the

escrow papers * * * in the event of failure to perform on the part of second parties * * * then to deliver said escrow papers to the first party. * * *."

This agreement further provides that on full payment, Bottum shall convey all of his right, title and interest in the claims and "shall arrange also to convey all of the right, title and interest of Glen Graeger, Tom Finch and Dee Finch * * * to second parties."

On September 7, 1954, the purchasers paid the initial payment of $25,000.00 to the Bank and there was opened an account in the Bank labeled "Escrow Account, F. M. Bottum, Agent," and there was credited thereto the sum of $25,000.00. This amount was held in the Bank awaiting release thereof, as provided in the contract, which contains the following:

"* * * the parties of the second part [Mohlers, purchasers] * * * shall have the right upon advising the first party that the second parties are satisfied as to the legal title of the mining claims * * * to immediately take possession * * * and first party [Bottum] * * * shall have the right to apply the down payment of $25,000 above mentioned and to place this contract in full force and effect * * *."

Mohlers, on September 27, 1954, notified Bottum of the acceptance of the contract for the purchase of the Echo and Hatch claims and went into possession thereof.

On September 8, 1954, the Bank deeded back to Graeger the Hatch claims. This deed is signed by Don D. Noble, cashier, and F. M. Bottum signed as a witness. On that same date Finch and Graeger had, at the request of Bottum, executed and delivered to the Bank separate deeds conveying their claims to the Mohlers. Finch and Graeger both testified that those deeds were delivered to the Bank with the very definite understanding that they would be held by the Bank and delivered on payment to the Bank of $150,000.00, to be distributed by the Bank to them; eight-fifteenths was to

be paid to Finch, and seven-fifteenths to Graeger and his co-owners. Bottum did not deny this testimony.

On October 5, 1954, at the request of Bottum, a meeting was held at the Bank. Present were: Bottum, Finch, Graeger, Dorothy Holt and John F. Hoyman, attorney for Dorothy Bonner. One purpose of the meeting was to arrange for necessary deeds to be placed in escrow with the Bank in compliance with the sales contract; another purpose was to make sure that $70,000.00 of the total purchase price of $150,000.00 be allocated as payment for the eight Hatch claims and Echo claims 1, 2 and 3, and that one-half thereof, or $35,000.00, be paid to Dorothy Holt and Dorothy Bonner, they owning an undivided one-half interest in said last mentioned claims as tenants in common with Graeger, also to make sure that Finch received $80,000.00 for his two claims.

At that time Dorothy Holt and Dorothy Bonner executed a deed conveying their interest in the claims to "Jack Turner and Associates" (another name for the Mohlers) and directed a letter to the Bank enclosing the deed and designating the Bank as "escrow agent for the undersigned [Dorothy Holt and Dorothy Bonner] in this transaction," and directing the Bank to hold the deed until the purchase price of $70,000.00 is paid and $35,000.00 thereof made available to them.

On October 7, 1954, Bottum wrote checks on the above mentioned escrow account as follows:

Graeger ........................................................................$9000.00
Dee Finch (for Graeger) ........................................... 2000.00
F. M. Bottum ............................................................. 2500.00
Dorothy Bonner ........................................................ 4500.00
Dorothy Holt .............................................................. 4500.00
Tom Finch .................................................................. 2500.00

$25,000.00

At the time Finch received this $2500.00 he did not know how much had been paid on the contract of sale,

nor did he have any information as to how much, if anything, the others had received. He cashed his check.

At the time of this distribution Graeger was indebted to the Bank, also indebted to Dee Finch, and had agreed with the Bank that it could collect the amount due it, also the amount due Dee Finch, from his distributive share. On receipt by Graeger of the $9000.00 he deposited the same in his checking account at the Bank and wrote checks to the Bank and Dee Finch totaling about $9000.00. This was applied on his indebtedness to the Bank and Finch.

Shortly prior to January 7, 1955, the purchasers sent their check to Bottum for the second payment of $50,-000.00. At that time Bottum was in the hospital where he endorsed the check and it was sent by the Bank, acting through Noble, the son-in-law of Bottum, and assistant cashier of the Bank, for collection to the Idaho bank on which it was drawn. The Idaho bank sent to the Bank its cashier's check for the $50,000.00, on receipt of which the Bank deposited the same in an account labeled "In account with Graeger Escrow Account." On this account someone, sometime, lined out the word "Graeger" with pen and ink and substituted the word "Bottum" therefor.

Bottum wrote checks on this account as follows:

| | | |
|---|---|---:|
| 1/10/55 | Finch | $12,500.00 |
| 1/10/55 | Greager | 12,500.00 |
| 1/10/55 | Dorothy Holt | 4,375.00 |
| 1/10/55 | Dorothy Bonner | 4,375.00 |
| 1/12/55 | F. M. Bottum | 15,000.00 |
| 3/12/55 | Cash (not endorsed) | 200.00 |
| 3/12/55 | For White Canyon Venture (not endorsed) | 200.00 |
| 5/24/55 | Bank (not endorsed) | 770.00 |
| 12/3/55 | F. M. Bottum (not endorsed) | 80.00 |

$50,000.00

No further payments were made and the purchasers relinquished all of their rights to the property.

Finch claimed that he knew nothing until the fall of 1956 as to the $75,000.00 having been paid, whereupon he requested the Bank to see the papers, including the purchase contract. This request was denied.

In 1957 Finch filed an action pursuant to Rule 27, R.C.P. Colo., and at that time the Bank's records were made available for inspection and copying, and he then, according to his undisputed testimony, for the first time became aware of the amount paid and the manner in which the funds had been distributed.

Trial was to a jury, on completion of which eleven questions were submitted to the jury for answer, dealing with questions of fact pertinent to the resolution of the claim of Finch against the Bank. All questions were answered supporting the contentions of Finch.

Supplementing these questions and answers the Bank and Greager stipulated that Bottum had not notified Finch or Greager before the first or second payments were made on what basis he was distributing the money received and that it was understood between Bottum and Greager prior to or at the time Greager received the $9000.00 check that he would pay off his indebtedness to the Bank and also his indebtedness to Dee Finch out of the "first money he received from the deal."

The trial judge made extensive findings of fact, on which findings the judgments here for review were entered.

The main contention of the Bank is that Finch and Greager were dealing with Bottum and not the Bank, and that the Bank's obligation was to the purchasers of the property and Bottum and owed no duty to Finch or Greager.

Bottum did testify that the Bank had a board of directors who sometimes passed on loans; he did not give the name of any director and none, if any there were, was ever called as a witness. Bottum, testifying in his

own and the Bank's behalf, stated that at no time did he own over 30% of the stock of the Bank. Who owned the balance is undisclosed.

Both Finch and Greager testified that when called upon to leave their deeds with the Bank, they wanted to know what assurance they would have that they would get their money, and that Bottum assured them that the Bank would hold the deeds until the money was all paid and would distribute the money between them on the basis of eight-fifteenths to Finch seven-fifteenths to Greager. Bottum testified that this was the agreement. The division was modified on October 5, 1954, by written agreement signed by all who were to participate in the proceeds and Bottum; the Bank received notice in writing of this change and accepted the deed signed by Holt and Bonner in connection therewith.

The record is replete with testimony and other evidence that during the years in question, the only way the Bank functioned was through the Bottum family. Frank Bottum ran the show. He had his son-in-law, Noble, sign for the Bank in conveying back to Greager the claims which he had conveyed to the Bank as security for his loan. Noble sent the $50,000.00 check to Idaho for collection, received the amount in the form of a cashier's check payable to the Bank, and opened up an account in his father-in-law's name and credited the amount to his account. Edith Bottum signed for the Bank as cashier, in its acceptance of the escrow duties, as provided for in the contract of sale between Bottum and the Mohlers. She witnessed the signatures on agreements, as notary public acknowledged deeds and contracts and all of the documents involved, except the agreement between Bottum and the Mohlers and the agreement prepared by the attorney for Dorothy Holt and Dorothy Bonner.

One can search the record from beginning to end and nothing will be found where the Bank functioned in any manner except through the Bottum family.

In answering the eleven questions submitted to the

jury, it found the following facts: (1) Bottum assured Finch, at the time he delivered his deed, that the Bank would hold the deed until the purchase price was paid and would distribute the proceeds to those entitled thereto; (2) the foregoing took place prior to October 5, 1954, when additional instructions were given to the Bank as to distribution; (3) when Finch received his first check for $2500.00 on October 7, 1954, he did not know how much had been paid on the purchase price; (4), (5) and (6), when he received the second check of $12,500.00, he did not know that the purchasers had made total payments of $75,000.00 or that the second payment of $50,000.00 had been made; (7) and (8), Bottum never told Finch that $2500.00 was all he would receive from the first payment, or that the second payment of $12,500.00 was all that he was to receive from payments made up to that time; (10) that at the time Finch received his first check of $2500.00, Greager did not know that $25,000.00 had been paid on the purchase price; (11) that when Finch received his second check for $12,500.00 Greager did not then know how much had been paid by the purchasers.

All of these answers of the jury are supported by the evidence.

Counsel for the Bank urge three reasons for reversal and dismissal of Finch's claim against the Bank.

First, it is urged that Finch cannot hold the Bank answerable for distribution of the proceeds for the reason that the Bank did comply with the terms of the written contract between Bottum and the Mohlers and on which appears the endorsement:

"Escrow Agreement Accepted
San Miguel Basin State Bank
Norwood, Colorado
Edith D. Bottum
Cashier."

If this endorsement were all that the Bank had undertaken to do, there might be merit in counsels' contention.

The record clearly shows, the jury found, and the trial judge found, that the Bank, acting through Bottum, who had actual as well as apparent authority to bind the Bank, agreed to act as escrow agent for Finch, Greager, Holt, Bonner and Bottum, and to distribute the funds, Finch to receive eight-fifteenths thereof.

█ Thus we find the Bank in the unenviable position of having agreed (1) by written "Escrow Agreement Acceptance" to pay the purchase money to Bottum; (2) by oral agreement to distribute the purchase money between Finch, Greager, Holt and Bonner — this all arranged by Bottum, who acted in behalf of the Bank. The Bank is in no position to accept the benefits of the escrow and at the same time disavow the obligations in (1) above.

Bottum having, on October 5, 1954, signed the agreement for distribution of the purchase money to the respective owners of the property, who had placed their deeds in escrow with the Bank, waived his right to insist on payment to him as provided in his purchase contract with the Mohlers.

The Bank in its answer states that it had no power under its charter or under state statutes to act as escrow agent. It is noteworthy that the Bank did not offer any evidence of its charter or other limitations on its authority; it offered no evidence as to its by-laws, stockholders, except Bottum (who never owned over 30% of the stock), its directors — how many, or who they might be.

It is urged that Bottum was acting for himself and not the Bank. It is most apparent that he was acting for both — he wanted to make $50,000.00 for Bottum and he wanted the Bank to get its hands on Greager's share of the money so it could liquidate his indebtedness to the Bank, an indebtedness it was contemplating collecting through foreclosure proceedings just prior to the sale of the claims.

Bottum failed in his individual purpose to make $50,000.00; the Bank succeeded in its purpose, for by dis-

tributing $9000.00 to Greager, and seeing to it that it was credited to Greager's bank account, it collected over $6000.00 then due it, and by virtue of depositing this $9000.00 to Greager's checking account with the Bank the same took on a more rosy hue, the balance after other withdrawals being transferred from an overdraft of $29.65 to an actual balance of $410.90.

■ Clearly, the Bank profited by reason of its acting as escrow agent for the persons selling their claims, and it cannot avoid responsibility for its failure to follow the escrow directions. *Nolan v. Colorado Mortgage Co.*, 137 Colo. 103, 322 P. (2d) 98; *Colorado Mortgage Co. v. Nolan*, 141 Colo. 280, 347 P. (2d) 778.

■ Counsel suggest that the escrow agreement not being reduced to writing is void as being in violation of the statute of frauds. Here the contract had been completely performed by the sellers. The Bank had paid out all of the money in violation of its promise, and to say that it can find some comfort in the statute of frauds finds no sanction in law.

Finch is not seeking to enforce the escrow agreement beyond the period of one year, or at all. He only seeks to recover the amounts that became due him within four months after he deposited his deed.

The judgment in favor of Finch and against the Bank for $25,000.00 and interest thereon is affirmed.

Turning now to the claim of the Bank, seeking to recover back from Greager $6000.00 paid to him in excess of the amount due him.

■ The parties are agreed that Greager received $6000.00 more than he was entitled to — this was paid to him by Bottum out of his escrow account. Bottum, if anyone, not the Bank, is entitled to get this money back from Greager. The Bank paid the money to Bottum, who paid it to Greager. The Bank paid nothing to Greager and naturally can get nothing back.

The Bank, in seeking to recover $6000.00 from Greager, overlooks the fact that if it were to collect from Greager

and also collect $25,000.00 on its judgment against Bottum, it would have $6000.00 more than would be required to pay the Finch judgment and would be the recipient of a windfall of $6000.00.

Certainly Greager is not entitled to profit at the expense of another; he is not entitled to any windfall, but Bottum, not the Bank, is entitled to get the money.

We find no error in the judgment denying the Bank relief against Greager on its third party complaint.

The judgment is affirmed.

MR. CHIEF JUSTICE DAY not participating.